# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PLAYUP, INC.,             ) | |
|        ) | |
|        Plaintiff,    ) | Case No.: 2:21-cv-02129-GMN-NJK |
|   vs.        ) | |
|        ) | **ORDER** |
| DR. LAILA MINTAS,     ) | |
|        ) | |
|       Defendant.  ) | |
|        ) | |

Pending before the Court is the Motion for the Emergency Motion for Ex Parte Temporary Restraining Order, (ECF No. 2), filed by Plaintiff PlayUp, Inc. ("Plaintiff").[1]

Also pending before the Court is Plaintiff's Motion for Leave to File Under Seal Exhibits Attached to the Complaint, (ECF No. 9).[2]

For the reasons set forth below, Plaintiff's Motion for Temporary Restraining Order is **GRANTED in part and DENIED in part**. Plaintiff's Motion for Leave to File Under Seal is **GRANTED**.

---

[1] Plaintiff also filed a Notice of the Federal Court of Australia's Order, which restrains Defendant Dr. Laila Mintas from publishing false information about Plaintiff and disposing of Plaintiff's assets. (*See* Notice of Lodging Federal Court of Australia's Order, ECF No. 10).

[2] Plaintiff requests leave to seal its Interactive Operations Agreement and Online Market Access Agreement, which are attached as Exhibit 1 to Daniel Simic's Affidavit, at pages 133 through 293. (Mot. for Leave to File Under Seal, ECF No. 9). The Court finds good cause to seal the records. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (compelling reasons exist to justify sealing court records when court files may "release trade secrets"). Plaintiff alleges that these agreements contain commercially sensitive proprietary information regarding "PlayUp's operations, processes, and procedures with its partners." (Mot. for Leave to File Under Seal 2:17–18). The Court agrees and accordingly grants Plaintiff leave to file under seal the Interactive Operations Agreement and Online Market Access Agreement.

## I.   **BACKGROUND**

This action arises from Defendant Laila Mintas' ("Defendant's") purported use of Plaintiff's confidential information and alleged disparagement of PlayUp, Inc. in violation of Defendant's employment agreement with Plaintiff (the "Employment Agreement"). (*See* Compl. ¶¶ 8–10, 14, ECF No. 1).  Plaintiff alleges the following:

Plaintiff PlayUp operates a global online and sports betting business. (*Id*. ¶¶ 5–6).  In early 2019, Plaintiff sought to expand its gaming business into the United States. (Aff. Daniel Simic ("Simic Aff.") ¶ 9, Ex. 1 to Compl., ECF No. 1-2).  Plaintiff hired Defendant to develop its business operations within the United States.  (*Id*. ¶ 10).  On November 30, 2019, Plaintiff and Defendant entered into the Employment Agreement, in which Plaintiff agreed to serve as the Chief Executive Officer ("CEO") of PlayUp, Inc. for two years. (*Id*.); (*see also* Employment Agreement at 115–125, Ex. 2 to Compl., ECF No. 1-3).

 The Agreement includes a "Confidentiality, Non-Competition, Non-Solicitation, and Non-Disparagement" provision. (*See* Employment Agreement § 6).  Pursuant to the terms of the Agreement, "Confidential Information" is defined to mean "financial plans, business plans, business concepts, know-how and intellectual property and materials related thereto." (*Id*.).  The Agreement expressly imposes confidentiality and non-competition obligations.  For example, it prohibits Defendant from the following:

(a) Executive agrees that she shall not, directly or indirectly, take commercial or proprietary advantage of, profit from, use or disclose to any Person any Confidential Information, except in connection with the good faith performance of Executive's duties hereunder or required by law. If ordered by a court of competent jurisdiction to disclose Confidential Information, Executive shall immediately provide written notice of that fact to the Board, enclose a copy of the subpoena and any other documents describing the legal obligation, and cooperate with the Company's efforts to object to, or limit, the disclosure obligation.

(b) During the Employment Term, the Executive's Employment with the Company following the Employment Term, and for a period of six (6) months from the date of termination of Executive's employment for any reason, the Executive shall not,

> anywhere within the United States e ither as principal, agent, employee, consultant, partner, officer, director, shareholder, or in any other individual or representative capacity, own, manage, finance, operate, control or otherwise engage or participate in any manner or fashion in an employment, business, or other activity competitive with the Company.

(*See* Employment Agreement at 6–7).

Further, the Agreement expressly restricts Defendant from engaging "in any form of conduct or mak[ing] any statements or representations that disparage, portray in a negative light, or otherwise impair the reputation or commercial interests of the Company or its past, present and future Subsidiaries." (*Id*. § 6(e)).

Around November 2021, Plaintiff and Defendant began negotiations to renew Defendant's Employment Agreement. (Simic Aff. ¶¶ 22–23). Defendant demanded the following in exchange for renewing her contract: (1) an annual renumeration increase from $500,000.00 USD to $1,000,000.00 USD; (2) an increase in her PlayUp shareholding to a net 15% non-dilutable holding; (3) appointment to Global Chief Executive Officer of PlayUp; and (4) termination of Daniel Simic, current Global Chief Executive Officer of PlayUp. (*Id*. ¶ 24). Plaintiff and Defendant did not reach an agreement as to the terms of the renewal. (*Id*. ¶ 23).

In response to Plaintiff's refusal to Defendant's renewal terms, Defendant allegedly engaged in conduct directly in violation of the Agreement. (*Id*. ¶ 26). Specifically, Defendant purportedly contacted Mr. Sam Bankman-Fried, a proprietor of FTX Limited. (*Id*.). Plaintiff and FTX Limited were allegedly in negotiations for FTX Limited to purchase some of Plaintiff's assets for the sale price of $450 million USD plus script for staff incentivization in FTX (the "FTX sale"). (*Id*. ¶¶ 18, 26). During the negotiations, Defendant purportedly informed FTX Limited that "there is conflict within management of PlayUP, there are systemic issues, and that the company is not clean." (*Id*. ¶ 26). Plaintiff alleges that Defendant's statements ultimately caused the failure of the FTX sale. (*Id*.). Furthermore, as part of her response to Plaintiff's refusal to renew her proposed terms, Defendant purportedly threatened to

damage Plaintiff's reputation to gaming regulators, commercial and business trading partners, and customers. (*Id*.).

Plaintiff filed suit on November 30, 2011, alleging breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, and violation of the Nevada Uniform Trade Secrets Act ("NUTSA"), NRS Chapter 600A. (Compl., ECF No. 1).  Plaintiff also filed the instant Motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for an order, specifically enforcing:

> the "Confidentiality and Non-Disparagement obligations set forth in Sections 6(a) and 6(e) of her Employment Agreement, including but not limited to, her obligation not to use or disclose any of PlayUp's Confidential Information . . . [and] PlayUp's trade secrets for any other purpose other than in connection with the good faith performance of her duties under the Employment Agreement.

(Mot. Temporary Restraining Order ("TRO"), ECF No. 2).

## II.   **LEGAL STANDARD**

The same legal standard applies to both temporary restraining orders and preliminary injunctions sought pursuant to Federal Rule of Civil Procedure 65. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the analysis applied to temporary restraining orders and preliminary injunctions is "substantially identical"). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A court may grant such relief only upon a petitioner's showing of (1) likelihood of success on the merits, (2) likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities weighs in petitioner's favor, and (4) an injunction is in the public interest. *Id.* at 20.  A temporary restraining order is distinguished by its "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of*

*Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974); *see also* Fed. R. Civ. P. 65(b) (limiting temporary restraining orders to 14 days unless extended for good cause, and providing for expedited hearings on preliminary injunctions).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.  The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citing 11 C. Wright and A. Miller, Federal Practice and Procedure, Civil, § 2949 at 471 (1973)).

## III.   DISCUSSION

The Court, having considered the Complaint, Plaintiff's Motion, supporting affidavits, and accompanying exhibits, finds that Plaintiff has met each of the *Winter* factors as to its breach of contract claim.  Thus, the issuance of a limited temporary restraining order specifically enforcing Section 6(e) of the Employment Agreement is appropriate.

### A. NOTICE

A court may issue an *ex parte* temporary restraining order only if "the movant's attorney certifies in writing any efforts to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B).  Furthermore, the movant must supply "specific facts in an affidavit or verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

Here, Plaintiff sufficiently demonstrates that notice and further delay will cause immediate and irreparable injury to Plaintiff.  On November 26, 2021, Farshad Amirbeaggi, Plaintiff's counsel, spoke to Defendant but was unable to resolve the dispute. (*See* Aff. Farshad Amirbeaggi ("Amirbeaggi Aff.") ¶ 2, Ex. 4 to Compl., ECF No. 1-5).  Defendant's threats

appear substantiated as she reiterated her threat to others—including Benson Ross, an advisor to PlayUp's board, and Daniel Simic, Global CEO of PlayUP—with a December 1, 2021 deadline she refused to extend. (Simic Aff. ¶¶ 25–27).  In addition, Defendant appears to have carried out her threat to harm Plaintiff's reputation by making negative statements to FTX Limited during the negotiation of the FTX Sale. (*Id.* ¶ 26).  Plaintiff has thus shown that immediate and irreparable harm will result as to Plaintiff's reputation and goodwill if Defendant is notified of the temporary restraining order.

### B.  LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff argues that Defendant misappropriated Plaintiff's trade secrets in violation of the NUTSA and further, that Defendant breached the Employment Agreement. (*See* Mot. TRO 8:16–11:23).  The Court addresses each claim in turn.

#### 1.  Nevada Uniform Trade Secrets Act

Plaintiff alleges that Defendant has or threatens to misappropriate PlayUp's trade secrets and proprietary business information in direct violation of the Confidentiality provision in the Employment Agreement. (*Id.* 10:18–24).  In order to state a claim for misappropriation under the NUTSA, a plaintiff must allege: (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) that the misappropriation was made in breach of an express or implied contract or by a party with a duty not to disclose. *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000).  A trade secret is "information, including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its

secrecy." NRS 600A.030(5); 18 U.S.C. § 1839 (providing similar definition).  In addition, the NUTSA defines "misappropriation" as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" in specified circumstances. 18 U.S.C. § 1839(5)(A); NRS 600A.030.

Here, Plaintiff has not shown that it will likely meet each of these elements.  As to the first element, Plaintiff demonstrates that its Confidential Information—"financial plans, business plans, business concepts, know-how, and intellectual property"—are likely trade secrets under the NUTSA. (*See* Employment Agreement § 6).  "Factors to consider include the extent to which others outside the business know the information, the ease or difficulty with which others could acquire the information properly, whether the information was confidential or secret, and the measures the employer took to guard the information's secrecy." *V.C.X., Ltd. v. Burge*, No. 2:06-CV-00641-PMP-RJJ, 2006 U.S. Dist. LEXIS 88050, at *15 (D. Nev. Nov. 30, 2006) (citing *Frantz*, 116 Nev. at 467).  PlayUp's financial statements and affairs are discussed during monthly board meetings, limited to PlayUp's board and management. (Simic Aff. ¶ 33).  Plaintiff has made reasonable efforts to maintain said information private by engaging in restrictive covenants, like the Employment Agreement with Defendant, to limit the distribution of Confidential Information. (*See* Employment Agreement § 6).

Similarly, as to the third element, Plaintiff was contractually bound to not divulge Confidential Information to any person. (*See id.*).  The critical issue, therefore, is whether Plaintiff has sufficiently demonstrated that Defendant likely misappropriated or used Confidential Information.

Here, Plaintiff broadly argues that Defendant's misappropriation of Confidential Information during the FTX sale and Defendant's ongoing threats demonstrate that she likely misappropriated PlayUp's Confidential Information. (Mot. TRO 9:25–10:2, 10:18–24).

Plaintiff, however, fails to explain or provide specific evidence showing that Defendant used Confidential Information to stop the FTX sale.  In his affidavit, Daniel Simic, Global CEO of PlayUp, states that Defendant contacted Mr. Sam Bankman-Fried, proprietor of FTX and gave him false information. (Simic Aff. ¶ 26(a)).  Specifically, Defendant advised FTX Limited "that there is a conflict within management of PlayUp, there are systemic issues, and that the company is not clean, and in so doing has caused the failure of the sale of PlayUp to FTX." (*Id.*).  However, nowhere does Plaintiff identify that Defendant used Confidential Information to harm Plaintiff's reputation to FTX Limited.  As stated above, Plaintiff defines Confidential Information as financial plans, business plans, and intellectual property. (*See* Employment Agreement § 6).  It is just as likely that Plaintiff advised FTX Limited to not proceed with the sale without alluding to Plaintiff's business and financial plans.  Plaintiff has thus failed to make a "clear showing" that it is entitled to the "extraordinary remedy" of injunctive relief. *See Winter*, 555 U.S. at 22.

Plaintiff does not provide additional explanation in its Motion.  For example, Plaintiff argues that "[i]t is further undisputed that Dr. Mintas has misappropriated and/or threatens to misappropriate trade secrets in direct violation of her obligations as set forth in her Employment Agreement." (Mot. TRO 9:28–10:2).  Additionally, Plaintiff asserts that "the evidence will demonstrate that Dr. Mintas has or threatens to misappropriate PlayUp's trade secrets." (*Id*. 10:21–22).  Plaintiff, however, fails to provide specific evidence explaining how Defendant used Confidential Information to ultimately cause the failure of PlayUp's assets to FTX, or if Defendant even used Plaintiff's Confidential Information in the course of advising FTX.  The Court accordingly finds that Plaintiff fails to demonstrate that Defendant likely misappropriated Plaintiff's trade secrets.

///

///

1

2           **2.  Breach of Contract**

3               Nevertheless, Plaintiff demonstrates that Defendant likely breached her Employment

4   Contract.  Plaintiff seeks injunctive relief to enforce the terms of the Employment Agreement,

5   particularly the non-solicitation and non-disparagement provision. (Mot. TRO 13:16–19).  A

6   claim for breach of contract must allege (1) the existence of a valid contract; (2) that plaintiff

7   performed or was excused from performance; (3) that the defendant breached the terms of the

8   contract; and (4) that the plaintiff was damaged as a result of the breach. *See* Restatement

9   (Second) of Contracts § 203 (2007); *Calloway v. City of Reno*, 116 Nev. 250, 993 P.2d 1259,

10  1263 (Nev. 2000) ("A breach of contract may be said to be a material failure of performance of

11  a duty arising under or imposed by agreement.").  An enforceable contract requires: (1) an offer

12  and acceptance; (2) meeting of the minds; and (3) consideration. *May v. Anderson*, 121 Nev.

13  668, 119 P.3d 1254, 1257 (Nev. 2005).

14              Here, Plaintiff has demonstrated that a valid employment contract likely existed between

15  Plaintiff and Defendant.  Plaintiff provides a copy of the Employment Agreement signed by

16  then-Chief Executive Officer, Daniel Simic and Defendant Laila Mintas. (*See* Employment

17  Agreement at 12).  "Nevada law allows for the enforcement of reasonable restrictive covenants

18  in employment agreements, and recognizes that a valid, restrictive covenant may be enforced

19  by way of temporary and permanent injunctive relief." *Accelerated Care Plus Corp. v.

20  Diversicare Mgmt. Servs. Co.*, No. 3:11-cv-00585-RCJ-RAM, 2011 U.S. Dist. LEXIS 93839, at

21  *10 (D. Nev. Aug. 22, 2011) (citing Nev. Rev. Stat. § 613.200).  Here, the Employment

22  Agreement provides a restrictive covenant preventing Defendant from engaging or participating

23  in an employment, business, or other activity competitive with the Company in the United

24  States during the course of her employment and for six (6) months from the date of termination.

25  (Employment Agreement § 6(b)).  The six-month restrictive covenant appears reasonable under

the circumstances and according to Nevada law. *See Ellis v. McDaniel*, 95 Nev. 455, 596 P.2d 222 (Nev. 1979) (upholding a two-year restrictive covenant).

Plaintiff has also shown that Defendant performed under the contract given that she served as the Chief Executive Officer for approximately two-years.  By Daniel Simic's own admission, "PlayUp's expansion into the United States has been very successful.  It is lead in the United States by [Defendant]." (Simic Aff. ¶ 16).

As to breach, Plaintiff has also established that Defendant likely breached the Employment Agreement.  Defendant agreed, pursuant to the Employment Agreement, not to "make any statements or representations that disparage, portray in a negative light, or otherwise impair the reputation or commercial interests of the Company." (Employment Agreement § 6(e)).  Defendant breached this provision, during the course of her employment as CEO of PlayUp, when she apparently advised FTX about conflict within PlayUp's management regarding Simic's criminal and unethical conduct and other systemic issues at PlayUp. (Simic Aff. ¶ 26).  Without the benefit of counter-evidence, these issues appear to have negatively impacted PlayUp during its crucial negotiations with FTX Limited.  Furthermore, Defendant allegedly stated that "FTX made [her] an offer to do something directly with them," and that she believed she could take various licenses with her, suggesting that Defendant breached the non-competition provision of the Employment Agreement. (Afff. Ross Benson ("Benson Aff.") ¶ 11, Ex. 3 to Compl., ECF No. 1-4)  Lastly, Plaintiff has demonstrated that it was likely damaged as a result of Defendant's breach, including loss of goodwill, damage to reputation, and loss of future profits, all illustrated by the failed sale to FTX.  The Court accordingly finds that the first *Winter* factor—likelihood of success on the merits—weighs in Plaintiff's favor as to its breach of contract claim.

///

///

1

### C.  LIKELIHOOD OF IRREPARABLE HARM

2

Plaintiff also argues that it will be irreparably harmed if the Court declines to issue a

3

temporary restraining order. (Mot. TRO 11:24–12:13).  To carry its burden, Plaintiff must also

4

establish that it will likely suffer irreparable harm without the issuance of injunctive relief.

5

*Winter*, 555 U.S. at 21.  Plaintiff must "demonstrate a likelihood of irreparable injury—not just

6

a possibility—in order to obtain preliminary relief." *Id.*

7

Here, given the timing and sequence of events, and without the benefit of counter-

8

evidence, the Court can reasonably infer that Defendant intends to continually disparage

9

Plaintiff in the course of carrying out her threats to harm Plaintiff's reputation and standing.

10

According to Plaintiff's evidence, Plaintiff and FTX Limited were in negotiations for the sale

11

of Plaintiff's assets as early as August 27, 2021. (Simic Aff. ¶ 18).  On November 10, 2011,

12

Defendant threatened to "burn PlayUp to the ground" and further commented that "FTX don't

13

[sic] even want the Australian business." (*Id*. ¶ 32(b)).  The deadline for the FTX sale was

14

November 27, 2021. (*Id*. ¶ 32(f)).  Taken together, the Court can infer that Defendant carried

15

out her threats to harm PlayUp's reputation, standing, and goodwill. *See Rent-A-Center, Inc. v.*

16

*Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (upholding

17

the district court's issuance of a preliminary injunction to enforce non-compete agreement and

18

finding that "intangible injuries" to advertising efforts and goodwill can constitute irreparable

19

harm).  Indeed, Ross Benson, an advisor to PlayUp's board, stated in his Affidavit that

20

Defendant "has sufficient control over PlayUp and PlayUp Inc.'s technology, records,

21

operations, data, and contracts to enable her to carry out the threats that she is making."

22

(Benson Aff. ¶ 12).  Plaintiff has thus shown that allowing Defendant to continuously spread

23

disparaging comments concerning PlayUp, Inc. will likely result in immediate and irreparable

24

injury to Plaintiff in the form of loss of income, loss of goodwill, damage to its reputation, and

25

damage to its business relationships. (Simic Aff. ¶ 26); *see Saini v. Int'l Game Tech.*, 434 F.

Supp. 2d 913, 919 (D. Nev. 2006) (holding that the harm occasioned by disclosure of trade secrets or confidential information is sufficient to meet the irreparable harm requirement); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853 (N.D. Cal. 2019); *Planned Parenthood of Great Nw. & Hawaiian Islands, Inc. v. Azar*, 352 F. Supp. 3d 1057, 1065 (W.D. Wash. 2018). The likelihood of irreparable harm element is therefore satisfied.

### D.  BALANCE OF EQUITIES

Plaintiff asserts that the balance of hardships also weigh in its favor. (Mot. TRO 12:14–13:2). The Nevada Supreme Court has recognized that "[e]mployers commonly rely upon restrictive covenants, primarily nondisclosure and noncompetition covenants, to safeguard important business interests." *Traffic Control Servs. v. United Rentals Nw., Inc.*, 120 Nev. 168, 172, 87 P.3d 1054, 1057 (2004). The interest of the business (e.g., the potential loss of goodwill) is often balanced with the loss of a person's livelihood. (*Id.* at 7).

Here, the balance of equities tip in favor of Plaintiff. If Defendant does not carry out her threats of spreading false information about Plaintiff, then imposition of this temporary restraining order will not harm Defendant. Conversely, even if Defendant disparages Plaintiff's reputation and standing, imposing this temporary restraining order will not harm any of Defendant's personal interest. Imposing this temporary restraining order will effectively hold Defendant to the terms of the already agreed-upon Employment Agreement. As such, this factor favors Plaintiff.

### E.  PUBLIC INTEREST

"The public interest analysis for the issuance of [injunctive relief] requires [district courts] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (citation omitted). In this case, the Court finds no such public interest that would be injured by the issuance of such injunctive relief.

In sum, the Court finds that Plaintiff has satisfied the requirements of imposing a temporary restraining order on Defendant; however, only as to Plaintiff's breach of contract claim. As explained above, Plaintiff demonstrated a likelihood of success on the merits of its breach of contract claim; however, failed to show that Defendant likely misappropriated trade secrets during the FTX sale. The Court accordingly grants a limited temporary restraining order to hold Defendant to the Non-Disparagement provision of the Employment Agreement—Section 6(e). *See Gallagher Benefit Servs. v. De La Torre*, 283 F. App'x 543, 546 (9th Cir. 2008) ("Where injunctive relief is warranted, the order must be narrowly tailored to 'remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law.'") (citing *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (per curiam) (citation omitted)).

### F.  BOND

The issuance of a temporary restraining order is conditioned on the movant posting security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The district court is afforded wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). Further, a strong likelihood of success on the merits may favor "a minimal bond or no bond at all." *California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985).

Given the likelihood that Plaintiff will succeed on the merits of its breach of contract claim and the limited hardship that a temporary restraining order will impose, there is a low probability that Defendant will suffer damages caused by an improperly granted temporary restraining order. The Court therefore declines to order a bond in this case.

## IV.    **CONCLUSION**

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order, (ECF No. 2), is **GRANTED in part and DENIED in part**.  Defendant is **TEMPORARILY RESTRAINED** from:

(1) engaging in any form of conduct or making statements or representations that disparage, portray in a negative light, or otherwise impair the reputation or commercial interest of Plaintiff PlayUp, Inc., although Defendant is not prevented from making any disclosure required or permitted by law; and

(2) breaching Section 6(e) of the Employment Agreement entered into by and between Defendant and Plaintiff, including various other terms and obligations merged therein.

**IT IS FURTHER ORDERED** that Plaintiff shall serve Defendant with a copy of this Order by Monday, December 6, 2021.

**IT IS FURTHER ORDERED** that Defendant shall have until Monday, December 13, 2021, to file its response brief to Plaintiff's Motion for Preliminary Injunction, (ECF No. 4). Thereafter, Plaintiff shall have until Wednesday, December 15, 2021, to file its reply brief.

**IT IS FURTHER ORDERED** that this matter is set for hearing on Plaintiff's Motion for Preliminary Injunction on Thursday, December 16, 2021, at 11:00 A.M. in Las Vegas Courtroom 7D.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Under Seal Exhibits Attached to the Complaint, (ECF No. 9), is **GRANTED**.  The Clerk's Office is directed to seal Exhibit 1 of the Complaint.  Plaintiff is to file a redacted copy of Exhibit 1.

**DATED** this __3__ day of December, 2021.

_____
Gloria M. Navarro, District Judge
United States District Court