# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| PLAYUP, INC.,<br><br>            Plaintiff,<br><br>    vs.<br><br>LAILA MINTAS,<br><br>            Defendant. | Case No.: 2:21-cv-02129-GMN-NJK<br><br>**ORDER** |
| LAILA MINTAS,<br><br>            Counter-Claimant,<br><br>    vs.<br><br>PLAYUP INC., *et al.*,<br><br>            Counter-Defendants |  |

Pending before the Court is the Motion for Entry of a Partial Final Judgment, (ECF No. 485), filed by Defendant and Counter-Claimant Dr. Laila Mintas.  Plaintiff and Counter-Defendant PlayUp, Inc. ("PlayUp US") and Counter-Defendant Daniel Simic filed a Response, (ECF No. 494), to which Mintas filed a Reply, (ECF No. 497).  Also pending before the Court is the Motion for Leave to File a Surreply, (ECF No. 500), filed by PlayUp US and Simic. Mintas filed a Response, (ECF No. 504), to which PlayUp US and Simic filed a Reply, (ECF No. 505).

Also pending before the Court is Mintas' Motion for Summary Judgment, (ECF Nos. 536, 538).  PlayUp US and Simic filed a Response, (ECF No. 553), and Mintas filed a Reply, (ECF No. 575).  Further pending before the Court is the Motion for Partial Summary Judgment,

(ECF No. 539), filed by PlayUp US and Simic.  Mintas filed a Response, (ECF No. 552), to which PlayUp US and Simic filed a Reply, (ECF No. 576).

For the reasons explained below, the Court DENIES Mintas' Motion for Partial Final Judgment.  The Court also GRANTS Mintas' Motion for Summary Judgment as to PlayUp US's claims against her and DENIES her Motion for Partial Summary Judgment on her counterclaims against PlayUp US and Simic.  Further, the Court GRANTS, in part, and DENIES, in part, PlayUp US and Simic's Motion for Partial Summary Judgment on Mintas' counterclaims.

## I.  **BACKGROUND**

This case arises from a dispute between a company and its former CEO.  Defendant and Counter-Claimant Dr. Laila Mintas served as the CEO for PlayUp Inc. ("PlayUp US"), a Delaware corporation, from 2019 to 2021. (Mintas Decl. ¶ 3, Ex. 11 to Mintas Mot. Summ. J ("Mintas MSJ"), ECF No. 536-1)).  Plaintiff and Counter-Defendant PlayUp US is a wholly-owned subsidiary of PlayUp Ltd. ("PlayUp AUS"), an Australian company. (Simic Aff. ¶ 13, Ex. 1 to Compl., ECF No. 12).  Counter-Defendant Daniel Simic is the CEO, director, and largest shareholder of PlayUp AUS. (*Id.* ¶ 1).  Simic has also been the sole director, President, Treasurer, and Secretary of PlayUp US since December 2021. (PlayUp Shareholder Consent, Ex. 6 to Mintas MSJ, ECF No. 536-1).

Mintas entered into two employment agreements with PlayUp.  The first employment agreement was entered into on December 1, 2019. (2019 Employment Agreement at 12, Ex. A to First Am. Compl., ECF No. 134)  The Agreement included a compensation and benefits scheme for Mintas that provided for a base salary of $250,000 USD, among other specifications. (*Id.* ¶ 4(a)).  Mintas did not receive any salary or other compensation from December 1, 2019, until at least September 2020. (Arora Dep. 64:14–65:9, Ex. 2 to PlayUp US and Simic Part. Mot. Summ. J. ("PlayUp MSJ") App., ECF No. 540).  The parties dispute

whether she was later compensated for her work under the "catch-up" provision in the 2019 Employment Agreement. (*Id.* 64:6–19; 65:11–22); (Mintas Decl. ¶ 7, Ex. 11 to Mintas MSJ). The second employment agreement was entered into on September 30, 2020, which stated that Mintas' employment expired on November 30, 2021. (2020 Employment Agreement at 1, Ex. B to First Am. Compl., ECF No. 134)  When Mintas' second employment agreement was nearing its end, Mintas and PlayUp US began negotiating a new contract. (*See* Mintas and Simic WhatsApp Messages at 149, Ex. 7 to PlayUp MSJ App., ECF No. 540)  The parties disagree as to the substance and length of the negotiations, but it is undisputed that the PlayUp Board ultimately made the decision not to renew Mintas' contract. (Simic Dep. 577:1–20, Ex. 9 to PlayUp MSJ App.).

Around July of 2021, PlayUp AUS was discussing possible business deals with another company, FTX, including FTX's possible acquisition of PlayUp AUS (the "FTX deal"). (2021 Email from Simic to Ma at PUI001898, Ex. 19 to Mintas MSJ, ECF No. 536-1)  In a "letter agreement" dated August 27, 2021, and signed by PlayUp AUS and Alameda Ventures Ltd. (a company that was wholly controlled by FTX), the parties agreed to "enter into good faith discussions of the potential partial or full acquisition of the issued and outstanding share capital . . . of PlayUp AUS." (Alameda Letter at 1, Ex. 21 to Mintas MSJ, ECF No. 538-1); (Doc. at 1 n. 2, Ex. 18 to Resp. Mintas MSJ, ECF No. 553-1)  PlayUp US claims that PlayUp AUS reached an informal agreement with FTX for a sale price of $450 million USD and a $50 million incentive package for specific employees. (Arora Dep. 158:24–159:2, Ex. 2 to PlayUp MSJ App., ECF No. 558-2)  On November 24, 2021, an FTX representative sent Simic an email stating that it had "decided against a full acquisition," terminating the potential acquisition. (Nov. 24, 2021, Email, Ex. 15 to PlayUp MSJ App., ECF No. 540)  The parties disagree significantly about what led to the demise of the FTX deal: PlayUp AUS blames

Mintas, and Mintas alleges that Simic caused the deal to fall through. (*See* First Am. Compl. ¶ 12, ECF No. 134); (Third Am. Counterclaim ¶¶ 65–77, ECF No. 336).

On November 30, 2021, PlayUp US filed this suit against Mintas, alleging tort and contract claims relating to her employment with PlayUp US. (*See* Compl., ECF No. 1). PlayUp US immediately filed an Ex Parte Motion for Preliminary Injunction. (*See* Mot. TRO, ECF No. 2); (Emergency Mot., ECF No. 4). The Court initially granted in part and denied in part the TRO without the benefit of briefing or argument from Plaintiff. (*See* TRO, ECF No. 11). Following briefing and argument, however, the Court denied PlayUp US's Motion for Preliminary Injunction. (*See* Tr. 61:3–10, ECF No. 33).

After this case was filed, PlayUp US's attorney, Michael Popok, spoke to a reporter who published a two-part article about this case on bonus.com. (Popok Decl. ¶¶ 34–45, Ex. 1 to Resp. Mot. Disqualify Counsel, ECF No. 251). Additionally, sometime after filing this lawsuit, Simic attended a dinner at the Venetian Hotel with several PlayUp US and AUS employees, as well as other individuals. (Cheung Dep. 204:12–21, Ex. 5 to PlayUp MSJ, ECF No. 540). One of the attendees testified that, during the dinner, Simic said that Mintas had "blown the deal," and that she was trying to take over the business. (*Id.* 109:1–10).

In January 2020, Mintas filed counterclaims against PlayUp US, as well as PlayUp AUS's CEO Daniel Simic. (*See generally* Answer, ECF No. 34). Plaintiff later amended her counterclaim to add PlayUp AUS as a counter-defendant. (*See* First Am. Counterclaim, ECF No. 52). All counterclaims against PlayUp AUS have been dismissed for lack of personal jurisdiction. (*See* Order, ECF No. 301). Mintas now moves for entry of partial final judgment on that order. (Mot. Part. Final J., ECF No. 485). Mintas also moves for summary judgment on all of PlayUp US's claims against her and moves for partial summary judgment on her counterclaims against PlayUp US and Simic. (Mintas MSJ, ECF Nos. 536, 538). PlayUp US

and Simic also move for partial summary judgment on Mintas' counterclaims. (PlayUp MSJ, ECF No. 539).

**II.**            <u>**LEGAL STANDARD**</u>

 **A. Entry of Partial Final Judgment**

  Rule 54(b) of the Federal Rules of Civil Procedure provides that where, as here, an action involves multiple claims or parties, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). "Rule 54(b) relaxes the former general practice that, in multiple claims actions, all the claims had to be finally decided before an appeal could be entertained from a final decision upon any of them." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409 (2015) (internal quotation marks omitted). Thus, Rule 54(b) is designed to provide parties with an opportunity to appeal an unfavorable ruling before a case has fully terminated. *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435 (1956).

  A two-step process guides the Rule 54(b) analysis. "A district court must first determine that it has rendered a 'final judgment,' that is, a judgment that is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878 (9th Cir. 2005) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980)). "Then it must determine whether there is any just reason for delay." *Wood*, 422 F.3d at 878. The latter determination should consider: (1) the interrelationship of the certified claims and the remaining claims in light of the policy against piecemeal review; and (2) equitable factors such as prejudice and delay. *See Curtiss-Wright*, 446 U.S. at 8–10; *Gregorian v. Izvestia*, 871 F.2d 1515, 151–20 (9th Cir. 1989).

  Rule 54(b) "was adopted 'specifically to avoid the possible injustice of delay[ing] judgment o[n] a distinctly separate claim [pending] adjudication of the entire case . . . . The Rule thus aimed to augment, not diminish, appeal opportunity." *Jewel v. Nat'l Sec. Agency*, 810

F.3d 622, 628 (9th Cir. 2015) (quoting *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409 (2015)).  The rule is nevertheless applied "to prevent piecemeal appeals in cases which should be reviewed only as single units." *Id.* at 628 (quoting *Curtiss-Wright*, 446 U.S. at 10).  The main concern will normally be to adopt the approach that most efficiently disposes of a lawsuit.  "It is left to the sound judicial discretion of the district court to determine the 'appropriate time' when each final decision in a multiple claims action is ready for appeal. This discretion is to be exercised 'in the interest of sound judicial administration.'" *Wood*, 422 F.3d at 878 (quoting *Curtiss-Wright*, 446 U.S. at 7).

**B. Summary Judgment**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.*  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks and citation omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002).  "The

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the nonmoving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.        DISCUSSION

The Court first addresses Mintas' Motion for Partial Final Judgment before turning to the cross Motions for Summary Judgment.

### A. Entry of Partial Final Judgment

Mintas moves for entry of partial final judgment on the Court's Order dismissing PlayUp AUS for lack of personal jurisdiction. When considering a motion for partial final judgment under Rule 54(b), "[a] district court must first determine that it has rendered a 'final judgment,' that is, a judgment that is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Wood*, 422 F.3d at 878 (quoting *Curtiss-Wright Corp.*, 446 U.S. at 7). "Then it must determine whether there is any just reason for delay." *Wood*, 422 F.3d at 878. The latter determination should consider: (1) the interrelationship of the certified claims and the remaining claims in light of the policy against piecemeal review; and (2) equitable factors such as prejudice and delay. *See Curtiss-Wright*, 446 U.S. at 8–10; *Gregorian*, 871 F.2d at 1518–20.

The first prong of the 54(b) analysis is met because the Court's Order granting PlayUp AUS's Motion to Dismiss under Rule 12(b)(2) is an ultimate decision on Mintas' claims against PlayUp AUS. *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1484 (9th Cir. 1993) (concluding that district court properly entered judgment under Rule 54(b) after dismissing claims against certain defendants for lack of personal jurisdiction).  The Court concludes, however, that although *Core-Vent* indicates that judgment under Rule 54(b) may be appropriate when one party is dismissed for lack of personal jurisdiction, the circumstances here do not warrant the Court finding that there is "no just reason for delay."

The parties largely dispute whether the issue of personal jurisdiction over PlayUp AUS is wholly separate from the remaining claims such that an appeal of the instant decision would not present issues that would also be subject to a subsequent appeal. (Resp. 7:10–11:20, ECF No. 494); (Reply 4:7–7:2, ECF No. 497).  Because the claims asserted against PlayUp AUS are the same as those asserted against the remaining parties, and because Mintas' claims against PlayUp AUS are at least partly predicated on Simic acting as its agent, PlayUp US and Simic argue that the claims against the dismissed party are too intertwined with the claims against the remaining parties. (Resp. 7:1–11:20).  Mintas responds that, though there is an overlap between the substantive issues and claims asserted against PlayUp AUS and the remaining parties, an appeal on the issue of personal jurisdiction does not require a ruling on the substantive issues and is therefore separate. (Reply 6:11–15).

The Court agrees with Mintas that the personal jurisdiction analysis is distinct and separable from the remaining claims against PlayUp AUS and Simic.  Indeed, courts have often agreed to enter judgment under Rule 54(b) when, as here, some parties are dismissed for lack of personal jurisdiction while claims against other parties remain. *See e.g.*, *Core-Vent Corp.*, 11 F.3d at 1484; *Lester v. Presto Lifts, Inc.*, No. CV 12-398-PHX-PGR, 2012 WL 3596517, *1 (D.

Ariz. Aug. 21, 2012); *Animale Group, Inc. v. Sunny's Perfume, Inc.*, No. CIV A 507-CV-13, 2007 WL 2010476, at *2 (S.D. Tex. July 5, 2007).

The Court is guided, however, not only by this general proposition but by a "pragmatic approach focusing on severability and efficient judicial administration." *Wood*, 422 F.3d at 880. As the Supreme Court has explained, "[n]ot all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims." *Curtiss-Wright*, 446 U.S. at 8.  Here, considerations of "sound judicial administration" convince the Court that this case is best tried to a full conclusion in this forum and then sent to the Ninth Circuit as a "single unit." *See Jewel*, 810 F.3d at 628; *Curtiss-Wright*, 446 U.S. at 10.

First, this is not a case where the dismissed party is tangential to the main claims being asserted in the litigation, and thus immediate appeal of their dismissal may streamline the litigation. *Compare Core-Vent Corp.*, 11 F.3d at 1484 (no abuse of discretion in entering Rule 54(b) judgment as to four of nine defendants, where three of the defendants were individuals being sued for libel and the main remaining claims in the underlying litigation included antitrust claims against a corporate defendant), *with Gonzalez v. US Hum. Rts. Network*, No. CV-20-00757-PHX-DWL, 2021 WL 1312553, at *4 (D. Ariz. Apr. 8, 2021) (denying entry of Rule 54(b) judgment because of an overlap between the facts relevant to personal jurisdiction and the merits).  Here, there is significant overlap between the facts related to PlayUp AUS and the remaining parties, meaning that entering final judgment would increase the chance that the Ninth Circuit would have to review issues involving the same facts twice.

Importantly, the Court also denied Simic's Motion to Dismiss and found that it had personal jurisdiction over Simic. (Order 10:17–13:9, ECF No. 301).  It is possible that, at the resolution of this case, Simic will challenge that decision regarding personal jurisdiction on appeal.  So, if the Court granted this motion for entry of partial final judgment, and then Simic

later appealed his personal jurisdiction decision, the Ninth Circuit would be called upon to review an issue that is very intertwined with the issue they would be asked to review here. This is especially true because of the central role that Simic plays in Mintas' argument regarding personal jurisdiction over PlayUp AUS. (Order Granting Mot. Dismiss 5:5–7, ECF No. 461). Though the Court acknowledges the possibility that a second trial may be required if the Ninth Circuit were to reverse the personal jurisdiction decision, that consideration does not outweigh the need to avoid the piecemeal appeals that may result from granting this motion. *See Wood*, 422 F.3d at 878 ("[C]onsideration of judicial administrative interests is necessary to assure that application of the Rule effectively preserves the historic federal policy against piecemeal appeals.")

Moreover, it is at least possible that the personal jurisdiction question could become moot if Mintas does not prevail on her merits claims against PlayUp US and Simic. *See Gonzalez*, 2021 WL 1312553, at *4 (denying 54(b) motion on a personal jurisdiction issue because "the personal jurisdiction question may well become moot if Plaintiff cannot prevail on her merits claims"). Mintas' claims against PlayUp AUS are premised on the actions of Simic as the CEO of PlayUp AUS; if Mintas' claims against Simic are unsuccessful, it is likely that the claims against PlayUp AUS would be similarly unsuccessful.

Finally, regarding the needs of "sound judicial administration," there is no clear benefit to sending this case to the Ninth Circuit now, nor a clear detriment to the parties from waiting to send the case until the conclusion of the proceedings in this Court. It would be at least as efficient to send this lawsuit to the Ninth Circuit as a single unit as it would be to send part of it for review now, especially considering the likelihood that "interlocutory appeal would only prolong final resolution of [this] case." *See Jewel*, 810 F.3d at 625. In sum, denying this Motion comports with the strong judicial preference for unitary appeals, final judgments, and

the efficient use of judicial resources.  Accordingly, the Court DENIES Mintas' Motion for Entry of Partial Final Judgment.[1]

### B.  Cross Motions for Summary Judgment

Mintas moves for summary judgment on all six of the claims asserted against her in the First Amended Complaint. (Mintas MSJ 2:1–6).  She also moves for partial summary judgment on her Third Amended Counterclaim. (*Id.* 2:1–13).  PlayUp US and Simic also move for partial summary judgment on Mintas' counterclaims. (PlayUp MSJ 1:2–8).  The Court will first consider Mintas' Motion seeking entry of summary judgment on the First Amended Complaint, before considering the arguments regarding Mintas' counterclaims.

### i.    PlayUp US and Simic's First Amended Complaint

Mintas begins by arguing that the Court should grant summary judgment on all of PlayUp US's claims because it lacks standing to claim damages that were actually incurred by its parent company, PlayUp AUS. (Mintas MSJ 20:6–7).  For Article III standing, a plaintiff must show: (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of (i.e., traceability), and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  In addition to the immutable requirements of Article III, federal courts have adopted prudential principles that preclude the exercise of jurisdiction, including the requirement that "[a] litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).  Standing is not dispensed "in gross." *Lewis v. Casey*, 518 U.S. 343, 359 n. 6 (1996).  Rather, "a plaintiff

---

[1] PlayUp US and Simic filed a Motion for Leave to File a Surreply to Mintas' Reply, pursuant to Local Rule 7-2. They argue that Mintas cited new evidence to support an entirely new argument raised for the first time in her Reply, and thus they should be permitted to file a surreply to respond to that new argument. (Mot. Leave to File Surreply 1:5–3:21).  The Court agrees that Mintas advanced a new argument in her Reply, and therefore gives PlayUp US and Simic the opportunity to respond to that new argument.  Thus, the Court GRANTS the Motion for Leave to File a Surreply.  The Court does not, however, find that the new argument made in the Reply is relevant to the Court's analysis in this Order.  Thus, it does not change the Court's conclusion.

must demonstrate standing for each claim" and "for each form of relief" that is sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000)). At the summary judgment state, a plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true" to satisfy the requirements of standing. *Lujan*, 504 U.S. at 561 (internal citation and quotations omitted).

According to Mintas, summary judgment is warranted because the only damages PlayUp US is seeking are those resulting from the loss of the FTX deal, but FTX deal concerned the possible sale of PlayUp AUS, not PlayUp US. (*Id.* 21:1–5). So, she contends, the damages were suffered by PlayUp US's parent company, PlayUp AUS, and PlayUp US has failed to identify any evidence that it suffered a distinct injury from its parent corporation. (*Id.* 21:22–27). Without such a showing, Mintas argues that PlayUp US does not have standing to bring any of its claims. (*Id.* 21:26–27).

PlayUp does not dispute Mintas' assertion that a subsidiary cannot bring claims on behalf of its parent company because they are distinct entities.[2] Instead, the parties disagree on whether PlayUp US has suffered injury that is separate from the injury to its parent company. PlayUp US argues that it has standing to seek redress for the harm that flowed from PlayUp AUS to PlayUp US. (Resp. Mintas MSJ 13:6–14). It explains that the injury that flowed to PlayUp US from the failure of the deal includes "lost market access agreements, suspension of licensure, layoffs, and reputational harm to PlayUp US." (*Id.* 13:17–19) (citing Simic Decl. ¶¶ 11–14, App. to Resp. Mintas MSJ, ECF No. 553-1). Mintas contends, however, that the Court has barred PlayUp US from seeking damages other than "the amount of the anticipated acquisition by FTX." (Resp. Mintas MSJ 3:4–11) (quoting Sanctions Order, ECF No. 547).

---

[2] Indeed, "a subsidiary is a separate entity and cannot sue on behalf of its parent corporation." 9 Fletcher Cyc. Corp. § 4227.

Therefore, Mintas argues, PlayUp US cannot now assert that it has standing based on injuries for which it cannot seek damages. (Resp. Mintas MSJ 2:25–3:16).

The Court agrees.  Per the Magistrate Judge's Order, "PlayUp is limited to seeking damages at trial based on its theory that it is entitled to recover the amount of the anticipated acquisition by FTX, along with $50,000,000 for certain PlayUp employees." (Sanctions Order 5:8–10).  PlayUp US therefore cannot recover for the alternative injuries it claims it experienced separately from the loss of funds from the FTX deal.  Because "a plaintiff must demonstrate standing separately for each form of relief sought," PlayUp US must show that it has standing to seek damages for amount of the anticipated acquisition by FTX.

But PlayUp US does not meet its burden of showing that it has standing to seek those damages.  The agreement in principle for FTX to purchase PlayUp was between PlayUp AUS and FTX for "a partial or full . . . acquisition of the issued and outstanding share capital . . . of PlayUp." (Alameda Letter at 1, Ex. 21 to Mintas MSJ, ECF No. 537-1).  In his deposition, Simic explained that the deal would have resulted in $450 million paid to the shareholders of PlayUp AUS. (Simic Dep. 245:5–25, Ex. 4 to Resp. Mintas MSJ, ECF No. 553-2).  Thus, it appears that PlayUp AUS and its shareholders lost $450 million dollars, not PlayUp US. PlayUp US insists that because PlayUp US was the ultimate acquisition target of the deal, the loss of the deal was a direct loss to PlayUp US. (Resp. Mintas MSJ 12:2–13).  But as stated in PlayUp US's own Amended Complaint, and as supported by the evidence above, PlayUp AUS was in negotiations with FTX "to *buy the parent company* and all of its assets (including PlayUp US)." (First Am. Compl. ("FAC") ¶ 9) (emphasis added).  Moreover, PlayUp AUS has brought a case against Mintas in Australia with the same allegations and seeking $450 million in damages. (Simic Dep., 201:15–21; 301:1–25, Ex. 3 to Mintas MSJ).  And again, per Simic's own statement, the deal would have resulted in the payment of $450 million to PlayUp AUS and its shareholders. (Simic Decl. 245:5–25, Ex. 4 to Resp. Mintas MSJ).  Thus, whether

PlayUp US was the ultimate target is not relevant to the question of whether PlayUp US suffered a direct loss from the deal, because the deal was between PlayUp AUS and FTX and would have resulted in payment directly to PlayUp AUS. Outside of the assertion that PlayUp US was the actual acquisition target, PlayUp US does not provide any evidence to support its claim that the loss of the deal was a "direct loss to PlayUp US." (*See* Resp. Mintas MSJ 12:1–17).

PlayUp US also argues that it has standing to seek these damages as an intended beneficiary of the deal. There is a general principle in federal common law contract interpretation that "only a party to a contract or an intended third-party beneficiary may sue to enforce the terms of a contract or obtain an appropriate remedy for breach." *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JP Morgan Chase Bank, N.A.*, 671 F.3d 1027, 1033 (9th Cir. 2012). But the FTX deal did not actually result in the formation of a contract, so this principle of contract interpretation would appear to be irrelevant to this question on standing. PlayUp US does not cite any cases to support the notion that it has standing to sue as the intended beneficiary of a *potential* contract, rather than standing to sue to enforce an existing contract to which it is an intended beneficiary. Without such support, the Court is not persuaded that contract interpretation applies in this context. The Court therefore finds that PlayUp US has failed to meet its burden of showing that it has standing to seek to recover anticipated funds from the acquisition. Because this is the sole relief that PlayUp US can recover, the Court must grant summary judgment in favor of Mintas on all of PlayUp US's claims for lack of standing. *See Lujan*, 504 U.S. at 561.

### ii. Mintas' Counterclaims

Mintas asserts counterclaims for: (1) abuse of process against PlayUp US, (2) defamation per se against PlayUp US and Simic, (3) false light against PlayUp US and Simic, (4) promissory estoppel against PlayUp US, (5) fraud against PlayUp US, (6) breach of contract

against PlayUp US, (7) breach of the implied covenant of good faith and fair dealing against PlayUp US, (8) unjust enrichment against PlayUp US, (9) violation of the Fair Labor Standards Act against PlayUp US and Simic, (10) violation of NRS 608.016 and 608.140 against PlayUp US, (11) violation of the Nevada Constitution and NRS 608.250 against PlayUp US, and (12) violation of NRS 608.018 and 608.140 against PlayUp US. (*See generally* Third Am. Counterclaim). Mintas moves for summary judgment on her counterclaims for breach of contract (fifth claim) and her four wage and hours claims under Nevada and Federal law (ninth through twelfth claim). (Mintas MSJ 6:1–2). PlayUp US and Simic also move for summary judgment on the following counterclaims: abuse of process (first claim), defamation per se (second claim), false light (third claim), promissory estoppel (fourth claim), fraud (fifth claim), unjust enrichment (eighth claim), the wage and hour claims under Nevada and Federal law (ninth through twelfth claim), and her prayer for punitive and reputational harm damages. (PlayUp MSJ 1:2–8).

### a.  Abuse of Process

PlayUp US first seeks summary judgment on Mintas' abuse of process claim. To prevail on an abuse of process claim, a plaintiff must show: (1) an ulterior purpose by the defendants other than resolving the legal dispute; and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding. *Land Baron Invs. v. Bonnie Springs Family LP*, 356 P.3d 511, 519 (Nev. 2015). A party must provide "facts, rather than conjecture, showing that the party intended to use the legal process to further an ulterior purpose." *LaMantia v. Redisi*, 38 P.3d 877, 880 (Nev. 2002). An abuse of process claim also "requires a 'willful act,' and . . . merely filing a complaint and proceeding to properly litigate the case does not meet this requirement." *Land Baron Invs.*, 356 P.3d at 520. There must be some act subsequent to filing that abuses the process for the claim to succeed. *Laxalt v. McClatchy*, 622 F. Supp. 737, 752 (D. Nev. 1985).

PlayUp US contends that it is entitled to summary judgment on this claim because the undisputed record proves that it did not act with an ulterior purpose, and the actions it took were legitimate litigation activities. (PlayUp MSJ 10:2–8). The Court agrees that Mintas has failed to establish a "willful act" that would satisfy the second element of an abuse of process claim. Mintas asserts that the willful act performed by PlayUp US was seeking a temporary restraining order for the purpose of initiating "a smear campaign against Dr. Mintas." (Resp. PlayUp MSJ 15:4–5). But there is "no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Prosser on Torts*, Abuse of Process § 115, p. 877 (3rd ed. 1964). Mintas' argument is that PlayUp US sought a temporary restraining order for the unauthorized purpose of contacting media outlets to blame Mintas for the failure of the deal. (Resp. PlayUp MSJ 15:4–12). Even if this assertion is true, however, it does not amount to a viable abuse of process claim because "filing suit for an improper motive does not constitute an improper act lacking a legitimate function as a litigation procedure." *Momot v. Mastro*, 2010 WL 2696635, at *5 (D. Nev. July 26, 2010) (cleaned up). Mintas therefore fails to identify a "willful act" to support her abuse of process claim. Because Mintas has not alleged facts that could possibly establish an element of this claim, the Court grants summary judgment in favor of PlayUp US on the abuse of process claim.

### b.  Defamation Per Se

Next, PlayUp US and Simic move for summary judgment on Mintas' defamation per se claim. Under Nevada law, a *prima facie* case of defamation is established if the plaintiff alleges: "(1) a false and defamatory statement by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pacquiao v. Mayweather*, 803 F. Supp. 2d 1208, 1211 (D. Nev. 2011) (citing *Wynn v. Smith*, 16 P.3d 424, 427 (Nev. 2002)). "If the defamation tends to injure

the plaintiff in his or her business or profession, it is deemed defamation *per se*, and damages will be presumed." *Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 462 (Nev. 1993).

PlayUp US argues that the undisputed record in this case establishes that all of the allegedly defamatory statements it has made are subject to the litigation privilege and therefore must be dismissed. (PlayUp MSJ 15: 9–14). The litigation privilege is a "long-standing common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged." *Circus Circus Hotels v. Witherspoon*, 657 P.2d 101, 104 (Nev. 1983). This privilege, which acts as a complete bar to defamation claims based on privileged statements, recognizes that "[c]ertain communications, although defamatory, should not serve as a basis for liability in a defamation action and are entitled to an absolute privilege because 'the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements.'" *Jacobs v. Adelson*, 325 P.3d 1282, 1285 (Nev. 2014). The litigation privilege is broad; it applies inside and outside the courtroom so long as the statements are "in some way pertinent to the subject of the controversy" and "even if the communications were made with knowledge [of falsity] and malice." *Id.* at 903; *Clark County School Dist. v. Virtual Educ. Software Inc.*, 213 P.3d 496, 502 (Nev. 2009). Because absolute privilege is an affirmative defense, PlayUp US and Simic would bear the burden of proof at trial. *See Las Vegas Metro. Police Dep't v. Holland*, 527 P.3d 958, 963 (Nev. 2023). Therefore, to prevail on its motion for summary judgment, PlayUp US has the burden of establishing the absence of a genuine issue of fact on its litigation privilege defense. *See C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480.

The first basis for Mintas' defamation claim is statements made by Simic and PlayUp US's attorney during an interview with *bonus.com*. (Resp. PlayUp MSJ 19:28–20:3). As Mintas points out, the Nevada Supreme Court has held that "communications made to the media in an extrajudicial setting are not absolutely privileged, at least when the media holds no

more significant interest in the litigation than the general public." *Jacobs*, 325 P.3d at 1284. Thus, the litigation privilege does not apply to bar Mintas' defamation claim based on the statement PlayUp US's attorney made to the media. *See id.*

The second alleged defamatory statement was during a dinner at the Venetian Hotel, when Play Up US and Simic told a group of people who worked in the gaming industry that Mintas has "blown" the FTX deal, that she attempted to "take over" and "destroy" PlayUp, and that Mintas has allegedly done the same thing to a friend of Simic's. (Resp. PlayUp MSJ 20:3–8) (Cheung Dep. 103:12–111:15, Ex. 7 to Resp. PlayUp MSJ, ECF No. 552-2).  The third defamatory statement was a communication with a consultant for PlayUp AUS via WhatsApp. Simic said that Mintas had been "stood down" by her previous employer and that she had "broken every law under the [Australian] corporations act" and had committed other "illegal" acts. (Resp. MSJ 20:8–12) (WhatsApp Messages at MIN002594, Ex. 8 to Resp. PlayUp MSJ, ECF No. 552-2).

PlayUp US contends that the litigation privilege applies to these communications as well, because it "applies inside and outside the court room and need only be loosely related to the legal matter." (PlayUp MSJ 15:23–16:3) (quoting *Buckwater v. Van Wey*, No. 2:10-CV-108 JCM (LRL), 2010 WL 2609100, at *5 (D. Nev. June 24, 2010)).  But PlayUp US fails to recognize that "statements to someone who is not directly involved with the actual or anticipated judicial proceeding will be covered by the absolute privilege only if the recipient of the communication is 'significantly interested' in the proceeding." *Jacobs*, 325 P.3d at 1285 (quoting *Fink v. Oshins*, 49 P.3d 640, 645–46 (Nev. 2014)).  "A nonparty recipient must have a relevant interest in, or a connection to, the outcome of the proceeding." *Id.*  The nature of the recipient's interest in a case is a "case-specific, fact-intensive inquiry." *Id.* (quoting *Hall v. Smith*, 152 P.3d 1192, 1199 (Ariz. Ct. App. 2007)).  PlayUp has offered no evidence in its motion to support a finding that the recipients of the statements at the Venetian Dinner or the

WhatsApp messages had a significant interest in this litigation. (*See generally* PlayUp MSJ).  It therefore has not met its burden of showing that it would be entitled to judgment as a matter of law on its legal privilege affirmative defense as to these statements.

PlayUp US next argues that summary judgment is warranted because there is no evidence that the statements made proximately caused harm to Mintas. (PlayUp MSJ 16:23–17:5).  It argues that the scope of her purported damages of tens of millions of dollars cannot possibly be caused by the comments made to six individuals that Mintas complains about. (*Id.* 17:5–11).  But, as the Court explained above, "[i]f the defamation tends to injure the plaintiff in his or her business or profession, it is deemed defamation *per se*, and damages will be presumed." *Chowdhry*, 851 P.2d at 462.  Statements imputing a person's lack of fitness for a trade, business, or profession are "considered so likely to cause serious injury to reputation and pecuniary loss that these statements are actionable without proof of damages." *K-Mart Corp. v. Washington*, 866 P.2d 274, 282 (Nev. 1993).  For this kind of defamatory statement, "[n]o proof of any actual harm to reputation *or any other damage* is required for the recovery of damages." *Id.* (quoting *Prosser & Keeton on the Law of Torts* § 112, at 788 (5th ed. 1984)) (emphasis added).  "Otherwise stated, proof of the defamation itself is considered to establish the existence of some damages, and the jury is permitted, without other evidence, to estimate their amount." *Id.*  Thus, Mintas is not required to prove that her purported damages were caused by the defamatory statements. *See id.*  The issue of what amount of damages was actually caused by the complained of statements is an issue for the jury to the decide. *See id.* The Court therefore denies PlayUp US and Simic's Motion for Summary Judgment on this claim.

### c.  False Light

PlayUp US and Simic next move for summary judgment on Mintas' false light claim. To succeed in a false light claim, a plaintiff must show that the defendant's conduct: (1) "gives

publicity to a matter concerning another that places the other before the public in a false light," (2) "the false light in which the [plaintiff] was placed would be highly offensive to a reasonable person," and (3) "the [defendant] had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed." *Fulkerson v. Public Utilities Commission of Nevada*, No. 3:20-cv-00007, 2020 WL 5644879, at *5 (D. Nev. Sept. 22, 2020) (citation omitted). "False light, like defamation, requires at least an implicit false statement of objective fact." *Flowers v. Carville*, 112 F. Supp. 2d 1202, 1212 (D. Nev. 2000). But "[t]he false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation." *People for Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 895 P.2d 1269, 1273 n.4 (Nev. 1995), *overruled in part on other grounds, City of Las Vegas Downtown Redevelopment Agency v. Hecht*, 940 P.2d 127 (Nev. 1997) (quoting *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983)).

PlayUp US first argues that the alleged statements are protected by the litigation privilege. (PlayUp MSJ 18:8–24). It asserts that Mintas has not added additional factual support to her false light claim after the Court dismissed it on this ground. (*Id.*). But the Court specifically found that the claim would be barred by the litigation privilege to the extent the claim was based on publicity resulting from PlayUp US's failure to file documents under seal. (Order on Mot. Dismiss 11:3–5, ECF No. 324). To the extent Mintas' false light claim is based on PlayUp US's failure to file documents in this case under seal, the Court agrees that such a claim is barred by the litigation privilege and grants summary judgment in favor of PlayUp US and Simic on that basis.

But in her Third Amended Counterclaim, Mintas alleged an additional basis for her false light claim: Simic and PlayUp US's attorney giving an interview to *bonus.com*. (Third Am. Counterclaim ¶¶ 223–24). As explained in the defamation analysis, the litigation privilege does

not apply to statements made to the media when it does not have significant interest in the litigation. *Jacobs*, 325 P.3d at 1284. Thus, the portion of Mintas' false light claim that relies on the statements voluntarily made to the media is not barred by the litigation privilege. Mintas also bases her false light claim on the WhatsApp message and Venetian dinner discussed above. (Third. Am. Counterclaim ¶ 222). PlayUp US has failed to show that the litigation privilege applies to these statements. The Court therefore does not grant summary judgment in favor of PlayUp US on these bases for Mintas' false light claim.

PlayUp US next argues that the factual record is devoid of any facts to prove that PlayUp US or Simic had knowledge of or acted in reckless disregard as to the falsity of any statements. (PlayUp MSJ 18:25–19:19). Mintas points to several pieces of evidence that create a genuine issue of fact about whether PlayUp US and Simic had knowledge of the statements' falsity. (Resp. PlayUp MSJ 24:6–27). First, she identifies the November 24, 2021, email from Ramnik Arora at FTX setting forth the reasons why FTX was passing on the deal. (*Id.* 24:6–11). Because Simic received this email listing the reasons why FTX chose not to pursue the deal, Mintas argues that Simic had knowledge that his statements blaming Mintas for the loss of the deal were false. (*Id.*). Mintas also argues that at the time PlayUp US's attorney made the assertion that Mintas had intentionally caused the FTX deal to fail in August, PlayUp US was aware that the FTX deal had not yet failed because they were actively in the process of continuing to negotiate a new deal with FTX at the time the statement was made. (Bonus.com Article, Ex. 4 to Resp. PlayUp MSJ, ECF No. 552-2); (April 14, 2022, Simic Email, Ex. 21 to Mot. Compel, ECF No. 511-1); (April 9, 2022, Simic Email, Ex. 23 to Mot. Compel, ECF No. 511-1). Viewing these facts in the light most favorable to Mintas as the nonmoving party, the Court agrees that there is a question of fact as to whether Simic and PlayUp US were aware of the falsity of their statements.

Lastly, PlayUp US argues that Mintas' false light claim must fail because she provides no evidence to show she suffered mental distress in satisfaction of the injury requirement. (PlayUp MSJ 19:22–20:5). Mintas responds that she has provided a declaration in which she states that she suffered distress and anguish. (Mintas Decl. ¶¶ 15, 17, Ex. 2 to Resp. PlayUp MSJ, ECF No. 552-2). She also points to her husband's testimony that she suffered depression and loss of sleep as a result of the publication of the false statements. (Feridun Mintas Dep. 297:16–298:2, Ex. 5 to Resp. PlayUp MSJ, ECF No. 552-2).

Beyond recognizing that a false light claim requires a showing of "mental distress," the Nevada Supreme Court has not elaborated on what a party must show to meet that requirement. The Nevada Supreme Court has, however, explained that "in cases where emotional distress damages are not secondary to physical injuries, but rather, precipitate physical symptoms, either a physical impact must have occurred or, in the absence of physical impact, proof of 'serious emotional distress' causing physical injury or illness must be presented." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1287 (Nev. 1998). Additionally, in *Betsinger v. D.R. Hotron, Inc.*, the Nevada Supreme Court stated that it has relaxed the physical manifestation requirement in a few limited instances but declined to do so in the context of deceptive trade practices. 232 P.3d 433, 436 (Nev. 2010). The court explained that, unlike a case where it stated that "the nature of a claim of assault is such that the safeguards against illusory recoveries mentioned in *Barmettler* . . . are not necessary," there is "no guarantee of the legitimacy of a claim for emotional distress damages resulting from a failed real estate and lending transaction without a requirement of some physical manifestation of emotional distress." (*Id.*). Applying that logic here, the Court predicts that the Nevada Supreme Court would require evidence of a physical of manifestation of emotional distress to meet the mental distress requirement for a false light claim.

Mintas provides evidence that she felt "mental distress and anguish," had an inability to sleep, and experienced "depressions." (Mintas Decl. ¶¶ 15, 17, Ex. 2 to Resp. PlayUp MSJ); (Feridun Mintas Dep. 297:16–298:2, Ex. 5 to Resp. PlayUp MSJ). The Court finds that Mintas' husband's testimony that she suffered difficulty sleeping and depressive episodes is sufficient evidence of a physical manifestation of emotional distress to raise a genuine issue of fact as to the false light claim. Thus, the Court denies summary judgment on this claim.

### d. Fraud

PlayUp US also moves for summary judgment on the fraud claim against it. Under Nevada law, the elements of a common law fraud cause of action are: (1) the defendant made a false representation; (2) the defendant knew or believed the representation was false or the defendant had an insufficient basis for making the representation; (3) the defendant intended to induce the plaintiff to act or refrain from acting in reliance upon the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) damage to the plaintiff resulted from such reliance. *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592 (Nev. 1992); *see also Daou v. Abelson*, No. 2:11-cv-01385-PMP-GWF, 2014 WL 938508, at *4 (D. Nev. Mar. 10, 2014). Rule 9 of the Federal Rules of Civil Procedure additionally requires that fraud is plead with particularity. Fed. R. Civ. P. 9(b).

PlayUp US argues that Mintas' fraud claim is premised on the unsupported notion that PlayUp US promised her new employment but never intended to follow through. (PlayUp MSJ 20:16–18). It contends that there are no facts to support a finding that PlayUp *knowingly* made a false statement to Mintas about her contract. (*Id.* 21:2–6). Indeed, "[t]he mere failure to fulfill a promise or perform in the future . . . will not give rise to a fraud claim absent evidence that the promisor had no intention to perform at the time the promise was made." *Bulbman*, 825 P.2d at 592. Mintas responds that there is evidence that PlayUp, at the time it made promises about a new contract, had no intention of actually providing Mintas with a new contract. (Resp.

MSJ 26:7–11). Specifically, she points to notes summarizing a meeting between PlayUp and FTX held on November 15, 2021, in which Simic stated that he "had some candidates" to replace Mintas as CEO. (FTX Meeting Debrief Notes, Ex. 35 to Mintas MSJ, ECF No. 536-1). The debrief notes state: "Question about new USA CEO – Daniel [Simic] noted he had some candidates and we need someone who understands how to run a gambling business with prior experience." (*Id.*). To the extent Mintas' fraud claim is based on a promise of renewing a contract after this discussion, Mintas provides sufficient evidence to raise a genuine issue of fact regarding whether PlayUp US knowingly made a false statement. But Mintas does not raise any facts to support her fraud claim based on the statements made prior to November 10, and thus summary judgment for PlayUp US and Simic is appropriate for those statements.

Lastly, PlayUp US raises the argument that there is no evidence to support a finding that Mintas relied upon promises made by PlayUp US. (PlayUp MSJ 20:13 n. 12). Because there is no evidence that Mintas failed to look for other employment in reliance on the promises, PlayUp US asserts that Mintas fails to support the essential element of justifiable reliance. (*Id.*). But while PlayUp US insists that the undisputed evidence indicates that Mintas was seeking employment with FTX at the same time she was renegotiating her contract with PlayUp US, Mintas stated in her declaration that she declined to seek work elsewhere while she believed she was negotiating a new contract with PlayUp. (Mintas. Decl. ¶ 12, Ex. 2 to Resp. PlayUp MSJ, ECF No. 552-1).

PlayUp points to a document entitled "Game Plan" that Mintas sent to David Ma, an FTX Principal, on November 20, 2021. (WhatsApp Messages at 178, Ex. 12 to PlayUp MSJ App., ECF No. 540). In a series of WhatsApp messages, Mintas sent her CV and the "Game Plan" to Ma, and said "[m]y preference would be that you hire me directly from December and I build the entire Global Betting / iGaming business for you." (*Id.*). The Game Plan proposes several plan options for FTX that involve hiring Mintas and a timeline that states "LM to join

FTX from 1st December 2021 as Global CEO." (Game Plan, Ex. 13 to PlayUp MSJ App.).
Mintas characterizes this exchange and document as "an attempt to salvage the deal between
PlayUp and FTX after Ma has told her that FTX was not going to proceed." (Resp. Mintas MSJ
26:6 n. 6). But, even construed in the light most favorable to Mintas as the nonmoving party,
these documents do not support such a conclusion. Instead, they evidence the fact that Mintas
was seeking employment with FTX in November 2021, while she claims she was not seeking
employment in reliance on the promises of a new contract from PlayUp US. Mintas' Third
Amended Counterclaim alleges that she relied on PlayUp US's fraudulent misrepresentations
because she failed to seek employment elsewhere, and if not for PlayUp US's promises of a
new contract, she would not have failed to seek other employment. (Third. Am. Counterclaim
¶¶ 248–249). But because the evidence shows that Mintas did seek employment, Mintas cannot
prove that she justifiably relied on the promises and suffered reliance damages in satisfaction of
the essential elements of a fraud claim. Therefore, the Court grants summary judgment in favor
of PlayUp US on Mintas' fraud claim.

### e. Promissory Estoppel

PlayUp US next seeks summary judgment on Mintas' promissory estoppel claim for the
same reasons as the fraud claim. "To establish promissory estoppel four elements must exist:
(1) the party to be estopped must be apprised of the true facts; (2) he must intend that his
conduct shall be acted upon, or must so act that the party asserting estoppel has the right to
believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state
of facts; and (4) he must have relied to his detriment on the conduct of the party to be
estopped." *Pink v. Busch*, 691 P.2d 456, 459 (Nev. 1984). Because the Court already
determined in its fraud analysis that Mintas is unable to prove that she detrimentally relied on
PlayUp US's promises, which is also an element of a promissory estoppel claim, the Court
grants summary judgment in favor of PlayUp US on the promissory estoppel claim.

### f.  Breach of Contract

Mintas moves for summary judgment on her breach of contract counterclaim against PlayUp US.  Mintas asserts that PlayUp US breached her 2019 Employment Agreement by failing to: (1) pay her salary, (2) provide her with paid time off, and (3) award her shared equivalent to 11% of PlayUp AUS. (Mintas MSJ 33:2–4).  To succeed on a breach of contract claim, a plaintiff (or counter-claimant) must show: (1) the existence of a valid contract between the parties, (2) plaintiff's performance or inability to perform, (3) defendant's material failure to preform; and (4) damages resulting from the failure to perform. *See* Restatement (Second) of Contracts § 203 (2007); *Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000).

The parties do not appear to dispute whether a valid contract existed between the parties. (*See* Resp. Mintas MSJ 33:24–27).  Thus, the Court's analysis focuses on whether PlayUp materially failed to perform.  The 2019 Employment Agreement provided an extensive compensation and benefits scheme. (*See* 2019 Employment Agreement ¶ 4, Ex. A to First Amended Complaint).

Mintas first argues that the evidence demonstrates that she was not paid a salary and received no benefits or compensation between the effective date of the 2019 Employment Agreement until at least September 2020. (Mintas MSJ 33L19–22).  PlayUp US points to evidence showing that Mintas received her salary under the 2019 Employment Agreement through the "catch-up payment" option[3] in November 2020 in the form of stock options. (Arora Dep. 56:9–59:25, Ex. 2 to PlayUp MSJ App.).  Additionally, PlayUp US argues that Mintas admitted that she was paid all her salary in the first year of her employment in the redline of the agreement. (Exchange Regarding Redlined 2020 Employment Agreement at 4, Ex. 17 to Resp.

---

[3]  The 2019 Employment Agreement included a "catch-up provision" providing that Mintas "will not be paid any unpaid accrued salaries unless and until the successful completion of the pre-IPO round of investment at which point [Mintas] will receive a catch-up payment within fourteen days of the completion of the pre-IPO round." (2019 Employment Agreement ¶ 4, Ex. A to First Amended Complaint).

Mintas MSJ Addendum, ECF No. 540).  In a comment on the draft 2020 Employment Agreement, Mintas wrote: "Salary now starts only from Oct 2020 because all previous salaries are already included in the 289 k one time payment." (*Id.*).  This evidence raised by PlayUp US is sufficient to demonstrate that there is, at minimum, a dispute of material fact on whether Mintas was paid for her work under the 2019 Employment Agreement.

Mintas next argues that the undisputed evidence shows that PlayUp US failed to award Mintas the seven percent of shares in PlayUp AUS that it owed her upon the effective date of the 2019 Employment Agreement, as well as the four percent owed upon PlayUp's successful acquisition of two market access agreements. (Mintas MSJ 33:25–34:13).  PlayUp US again responds with evidence sufficient to raise a dispute of material fact on whether Mintas was granted the equity she was owed under the 2019 Employment Agreement. (Resp. Mintas MSJ 33:10–34:5).  In a declaration, Mintas stated that "[a]ssuming I had approximately 10% in stock as I received 11% when I started and invested additionally $.1 million." (Mintas Decl. ¶ 31, Ex. 1 to Mintas Resp. Emergency Mot. for Temp. Restraining Order, ECF No. 22-1).  Moreover, Mintas stated in an email between Mintas and Simic on October 26, 2021, that she "received 11% in equity." (Oct. 26, 2021, Email, Ex. 21 to Resp. Mintas MSJ, ECF No. 553-1).  The Court finds that this evidence is sufficient to raise a genuine dispute of fact as to whether Mintas was granted the equity promised under the 2019 Employment Agreement.

Because PlayUp US has demonstrated that a genuine dispute of material fact exists as to whether it breached the 2019 Employment Agreement, the Court denies summary judgment on this claim.

### g.  Unjust Enrichment

PlayUp US and Simic move for summary judgment on Mintas' unjust enrichment claim. "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good

conscience." *Nevada Indus. Dev., Inc. v. Benedetti*, 741 P.2d 802, 804 n.2 (Nev. 1987). In Nevada, the elements of an unjust enrichment claim are: "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) acceptance and retention of the benefit by the defendant; (4) in circumstances where it would be inequitable to retain the benefit without payment." *Ames v. Caesars Ent. Corp.*, No. 2:17-cv-02910, 2019 WL 1441613, at *5 (D. Nev. April 1, 2019) (quoting *Leasepartners Corp., Inc. v. Robert L. Brooks Tr.*, 942 P.2d 182, 187 (Nev. 1997)).

Unjust enrichment is an equitable remedy, and as such, a claim for unjust enrichment "is not available where the plaintiff has a full and adequate remedy at law." *See Small v. Univ. Med. Ctr. of S. Nevada*, No. 2:13-cv-00298, 2016 WL 4157309, at *3 (D. Nev. Aug. 3, 2016). "A party cannot recover under a theory of unjust enrichment when an express agreement governs the rights and obligations of the parties to the lawsuit." *P.F. Chang's China Bistro, Inc. v. OpBiz*, L.L.C., No. 2:08-cv-01253-RLH-LRL, 2010 WL 11578973, at *6 (D. Nev. Jan. 20, 2010). PlayUp US argues that the existence of a valid, enforceable agreement—the 2019 Employment Agreement—is fatal to Mintas' claim for unjust enrichment. (PlayUp MSJ 20:18 n. 13). Neither party denies the existence of validity of the 2019 Employment Agreement; Mintas herself asserts that "[t]he undisputed evidence demonstrates that there was a contract between Dr. Mintas and PlayUp in the form of the 2019 Employment Agreement." (Mintas MSJ 33:9–13). As such, Mintas cannot show that there is an inadequacy of a legal remedy as is required to succeed on a claim of unjust enrichment. *See Small*, 2016 WL 4157309, at *3. Accordingly, the Court grants summary judgment in favor of PlayUp US on the unjust enrichment claim.

### h. Wage and Hour Claims (Claims 9-12)

Mintas brings four "wage and hour" counterclaims under the Fair Labor Standards Act

("FLSA") and its state-law equivalent, NRS Chapter 608. (Third Am. Counterclaim ¶¶ 279–310).  Both Mintas and PlayUp US move for summary judgment on these claims.  PlayUp US argues that Mintas was exempt from the FLSA's and the state law equivalent's requirements because she was an "employee employed in a bona fide executive capacity." (PlayUp MSJ 23:6–28:4).  In the alternative, it argues that damages that predate May 13, 2020, are barred by the FLSA's two-year statute of limitations. (*Id.* 28:5–29:1).  Mintas argues that summary judgment is warranted because she was not compensated for her work, so the highly compensated employee exception does not apply. (Mintas MSJ 34:18–35:19).

### i.  Exempt Employee

PlayUp US asserts that Mintas' wage and hour claims fail as a matter of law because Mintas is an exempt employee.  Under the FLSA, employers are required to pay minimum wages and overtime compensation to employees. *See* 29 U.S.C. §§ 206–207.  But "the FLSA does not require employers to pay overtime wages to employees that fall under the highly compensated exemption." *Kennedy v. Las Vegas Sands Corp.* No. 2:17-cv-880-JCM-VCF, 2019 WL 12043525, at *3 (D. Nev. July 22, 2019) (citing 29 C.F.R. § 541.601(c)).  Employees are exempt from the FLSA if they "(1) have a total annual compensation of at least $100,000.00; (2) customarily and regularly perform any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee; and (3) have a primary duty that includes office or non-manual work." *Id.* (citing 29 C.F.R. §§ 541.601(a), (c)–(d)).  The FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C § 213(a)(1).  The regulations further define "employee employed in a bona fide executive capacity" as an employee:

"(1) compensated on a salary basis . . . at a rate of not less than $684 per week . . .;

(2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) who customarily and regularly directs the work of two or more other employees; and

(4) who has the authority to hire or fire the other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight."

29 C.F.R § 541.100.

Whether an FLSA exemption applies is a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  Though the Ninth Circuit previously construed exemptions to the FLSA narrowly, the Supreme Court rejected that in favor of a "fair (rather than a 'narrow') interpretation." *Encino Motorcars, LLC. v. Navarro*, 584 U.S. 79, 88 (2018). Further, Nevada employees who are employed in bona fide executive, administrative or professional capacities are also exempted from the state's overtime law. NRS 608.018(3)(d).

PlayUp US first asserts that Mintas was "compensated on a salary basis," in satisfaction of the first requirement of the executive employee exemption. (PlayUp US 24:13–25:10).  The 2019 Employment Agreement expressly provides that she would be paid at the FLSA minimum amount and was to be paid a salary rather than an hourly wage. (2019 Employment Agreement ¶ 4, Ex. A to First Am. Compl.).  It further provided that Mintas would not be paid "any unpaid accrued salary unless and until the successful completion of the pre-IPO round of investment," at which point Mintas would receive a "catch-up payment" within 14 days. (*Id.* ¶ 4(b)). Because PlayUp US asserts that Mintas was compensated for her work, it argues that the salaried employee prong is met. (Arora Dep. 64:6–19; 65:11–19; 67:1–2, Ex. 2 to PlayUp MSJ App.).  Mintas disputes PlayUp US's statement that she was compensated for her work, arguing that the transfer of stock was not a "catch-up payment" but instead was made for a different purpose. (Resp. PlayUp MSJ 28:22–29:14).

But even if Mintas was compensated for her work via the "catch-up payment" provision of the Employment Agreement, the Court finds that Mintas is not a salaried employee for the purposes of the executive exemption.  "An employee will be considered to be paid on a 'salary basis' . . . if the employee regularly receives each pay period on a weekly, or less frequent

basis, a predetermined amount constituting all or part of the employee's compensation." *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 46 (2023) (quoting 29 C.F.R. § 541.602(a)). It is undisputed that Mintas did not regularly receive a predetermined amount of pay as the 2019 Employment Agreement provided. Therefore, she cannot be considered to have been paid on a "salary basis" for the purposes of the FLSA exemption. *See* 29 C.F.R. § 541.602(a). Because PlayUp has the burden of proving that each of the requirements of the executive exemption apply, and the Court finds that the first requirement cannot be met, PlayUp US's Motion for Summary Judgment on Mintas' wage and hour law claims is denied. Mintas' argument for summary judgment on these claims also fails, however, because there is a genuine dispute of fact as to whether Mintas was compensated for her work under the 2019 Employment Agreement.

### ii. Statute of Limitations

PlayUp US also argues that Mintas' damages on these claims can only be recovered for lost wages after May 13, 2020, because the FLSA's two-year statute of limitations bars earlier damages. (PlayUp MSJ 28:5–26:1). It argues that the two-year statute of limitations on Mintas' FLSA and Nevada wage claims began to run in December 2019, the date when her 2019 Employment Agreement went into effect, and she discovered the alleged non-payment of wages. (2019 Employment Agreement at 12, Ex. 2 to First Am. Compl.). Mintas brought her first wage and hour claims on May 13, 2022, over two years from the date on which the statute of limitations began to run. (*See* Second Am. Counterclaim, ECF No. 133).

Mintas contends that the Court should apply the three-year statute of limitations for "willful violations" of the FLSA. (Resp. Mintas MSJ 31:7–27). A "violation of the FLSA is willful if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *Roces v. Reno Hous. Auth.*, 300 F. Supp. 3d 1172, 1179 (D. Nev. 2018) (quoting *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003)). "Merely

negligent" conduct is not enough, and a court "will not presume that conduct was willful in the absence of evidence." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003). Mintas does not show that PlayUp was given notices of a possible FLSA violation, nor does she provide any other evidence to support a finding that the violation was so unreasonable as to support a claim of willful violation of the FLSA. *See Acosta v. Wellfleet Communications, LLC.*, No. 2:16-cv-02353-GMN-GWF, 2018 WL 4682316 , at *26 (D. Nev. Sep. 29, 2018) (finding a willful violation of the FLSA because the employer received multiple warning notices). The Court therefore finds that the two-year statute of limitations applies to bar Mintas from recovering damages for lost wages prior to May 13, 2020 for both her FLSA and Nevada state law claims. Accordingly, Mintas' four wage and hour claims proceed only to the extent they seek wages lost after that date.

### i. Punitive Damages

PlayUp US next asserts that it is entitled to judgment as a matter of law on Mintas' prayer for punitive damages. (PlayUp MSJ 29:3–7). Under Nevada law, a party is only entitled to punitive damages through a showing by clear and convincing evidence that the opposing party is guilty of oppression, fraud, or malice. NRS 42.005. According to PlayUp, the undisputed record does not contain clear and convincing evidence that would entitle Mintas to punitive damages. (PlayUp MSJ 29:2–31:1).

An employer can be liable for the wrongful acts of employees committed within the scope of employment if the employer had knowledge of the employee's acts, ratified the wrongful act, or was personally guilty of oppression, fraud, or mistake. *Wright v. Watkins & Shepard Trucking, Inc.*, No.: 2:11-cv-01575-LRH-GWF, 2014 WL 6388789, at *13 (D. Nev. Nov. 13, 2014); NRS 42.007(1). PlayUp US contends that there is no evidence in the record that PlayUp US had knowledge of or ratified any of Simic's alleged conduct, and thus it is entitled to summary judgment on punitive damages. (PlayUp MSJ 29:16–30:4). But, as Mintas

points out, Simic is an officer of PlayUp US, and courts generally recognize that a corporate officer's scienter is imputed to the corporation. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 474–79 (9th Cir. 2015).  Thus, the question is whether there is evidence in the record to support a finding that Simic is guilty of oppression, fraud, or malice by clear and convincing evidence.  PlayUp US and Simic do not make an argument regarding punitive damages against Simic beyond stating that if the Court grants summary judgment on all claims against Simic, no claims would remain that allow for punitive damages. (PlayUp MSJ 29:7 n. 19).  But since the Court did not dismiss the defamation per se and false light claims against Simic, there remains two claims against him.  Accordingly, the Court finds that PlayUp US does not meet its burden of showing that summary judgment is warranted on Mintas' prayer for punitive damages.

### j.  Damages for Reputational Harm

Lastly, PlayUp US and Simic move for summary judgment on Mintas' prayer for reputational damages because it contends that the record does not contain any evidence of reputational harm. (PlayUp MSJ 31:2–33:4).  But, as the Court discussed in its defamation per se analysis, Mintas is not required to provide evidence that her reputation was damaged because she brings a defamation per se claim. "Proof of the defamation itself establishes the fact of injury and the existence of damage to the plaintiff's reputation." *K-Mart*, 866 P.2d at 284 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 373 n.3 (1974).  Thus, if Mintas succeeds on her defamation per se claim, reputational damages are presumed, and assessing the amount of damages will be the role of the jury.  The Court therefore denies summary judgment on the reputational damages.

### C.  Conclusion on Claims Proceeding to Trail

In sum, the Court grants summary judgment in favor of Mintas on all of PlayUp US's claims against her.  None of PlayUp US's claims will proceed to trial.  Further, the Court grants

summary judgment in favor of PlayUp US and Simic on the following counterclaims brought by Mintas: abuse of process, fraud, promissory estoppel, and unjust enrichment.  The following counterclaims survive and will be resolved at trial: (1) defamation per se claim against PlayUp US and Simic based on the statements made to bonus.com, at the Venetian dinner, and in the WhatsApp conversation, with the possibility to seek implied reputational and punitive damages against both PlayUp US and Simic; (2) false light claim against PlayUp US and Simic based on the statements made to bonus.com with the option to seek punitive damages against both PlayUp US and Simic; (3) breach of contract claim against PlayUp US; (4) breach of the implied covenant of good faith and fair dealing against PlayUp US; (5) FLSA claim against PlayUp US and Simic for wages lost after May 13, 2020; (6) violation of NRS 608.016 and 608.140 against PlayUp US for wages lost after May 13, 2020; (7) violation of Nevada Constitution Article 15 § 16 and NRS 608.250 against PlayUp US for wages lost after May 13, 2020; and (8) violation of NRS 608.018 and 608.140 against PlayUp US for wages lost after May 13, 2020.

## IV.          CONCLUSION

**IT IS HEREBY ORDERED** that Defendant and Counter-Claimant Leila Mintas' Motion for Partial Final Judgment, (ECF No. 485), is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff and Counter-Defendant PlayUp US and Counter-Defendant Simic's Motion for Leave to File a Surreply, (ECF No. 500), is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant and Counter-Claimant Leila Mintas' Motion for Summary Judgment, (ECF Nos. 536, 538), is **GRANTED,** in part, and **DENIED,** in part.  The Court grants summary judgment on all of Plaintiff and Counter-Defendant PlayUp Inc.'s claims against Mintas but denies summary judgment on Mintas' breach of contract counterclaim (Claim 6), and her four wage and hours claims (Claims 9–12).

**IT IS FURTHER ORDERED** that Plaintiff and Counter-Defendants PlayUp Inc. and Daniel Simic's Motion for Partial Summary Judgment, (ECF No. 539), is **GRANTED,** in part, and **DENIED,** in part.  The Court grants summary judgment in favor of the movants on the abuse of process, fraud, promissory estoppel, and unjust enrichment claims, but denies summary judgment on the defamation per se claim, the false light claim, the four wage and hour claims, and the prayers for punitive and reputational damages.

**IT IS FURTHER ORDERED** that the parties will have thirty days from the date of this Order to file a jointly proposed pretrial order pursuant to LR 16-3(b) using the form provided in LR 16-4.

**DATED** this ___28___ day of March, 2025.

_____

Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT